1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DISH NETWORK, L.L.C., *et al.*, | ) | Civil No. 09-cv-1553-L(WVG) |
| Plaintiffs, | ) | **ORDER:** |
| v. | ) | **(1) GRANTING PLAINTIFFS'** |
| | ) | **MOTION FOR SUMMARY** |
| SONICVIEW USA, INC., *et al.*, | ) | **JUDGMENT [DOC. 136], AND** |
| Defendants. | ) | **(2) DENYING DEFENDANTS'** |
| | ) | **CROSS-MOTION FOR SUMMARY** |
| | ) | **JUDGMENT [DOC. 141]** |

On July 17, 2009, Plaintiffs DISH Network, L.L.C., EchoStar Technologies L.L.C. ("EchoStar"), and NagraStar L.L.C. filed their complaint against Defendants Sonicview USA, Inc., Roberto Sanz, Danial Pierce, Alan Phu, Duane Bernard, Courtney Bernard, and others, alleging violations of the Digital Millennium Copyright Act ("DMCA"), the Federal Communications Act ("FCA"), and the Electronic Communications Privacy Act. Now pending before the Court are the parties' cross-motions for summary judgment.

The Court found these motions suitable for determination on the papers submitted and without oral argument. *See* Civ. L.R. 7.1(d.1). (Doc. 172.) For the following reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment (Doc. 136), and **DENIES** Defendants' cross-motion for summary judgment (Doc. 141).

## I.   BACKGROUND

### A.   Plaintiffs' Subscription-Based Satellite TV Programming

DISH Network, EchoStar, and NagraStar operate various elements of the DISH Network satellite television distribution system.  DISH Network is a multi-channel provider that delivers video, audio, and data services via a direct broadcast satellite system to authorized subscribers throughout the United States.  (Duval Decl. ¶ 4 [Doc. 136-2].)  EchoStar designs, develops, and distributes receiver systems, satellite dishes, and other digital equipment for use in the DISH Network system.  (*Id.* ¶ 9.)  NagraStar provides DISH Network with "smart cards" that are used in EchoStar's satellite receivers to facilitate the decryption of DISH Network's programming signals.  (*Id.* ¶ 13.)

DISH Network contracts for and purchases the distribution rights for the copyrighted programming it broadcasts from outlets such as network affiliates, cable networks, motion-picture distributors, sports leagues, event promoters, and other holders of programming rights. (Duval Decl. ¶ 6.)  It uses high-powered satellites to broadcast, among other things, movies, sports, and general entertainment services to consumers who have been authorized to receive such services after payment of a subscription fee, or in the case of a pay-per-view movie or event, the purchase price.  (*Id.* ¶ 5.)  DISH Network then digitally encodes and scrambles the broadcast signals using NagraStar's encryption technology, and delivers the scrambled signals via satellite to the EchoStar dishes and receivers owned or leased by authorized subscribers.  (*Id.* ¶ 8.)

Plaintiffs use an encryption system to restrict access to their signals such that only authorized subscribers can decrypt the signals. (*See* Duval Decl. ¶ 11.)  To effectuate this decryption system, Plaintiffs use smart cards that carry a secured embedded microprocessor provided by NagraStar.  (*Id.* ¶¶ 9, 12.)  The microprocessor contains information that provides instructions and commands to the smart card in the everyday operation of the NagraStar security system as well as decryption keys.  (*Id.* ¶ 12.)  The EchoStar receiver possesses an incoming DISH Network satellite signal by locating an encrypted part of the transmission, known as the entitlement control message, and then forwards that message to the smart card.  (*Id.* ¶ 13.)  If the

09cv1553

2

subscriber is tuned to a channel he is authorized to watch, the smart card uses its decryption keys to unlock the message, uncovering a control word. (*Id.*)  The control word is then transmitted back to the receiver in order to decrypt the DISH Network satellite signal. (*Id.*)  Then the receiver and smart card convert DISH Network's encrypted satellite signal into viewable programming that can be displayed on the attached television of an authorized DISH Network subscriber. (*Id.*)

### B.   Piracy of DISH Network Programming Using Free-To-Air Receivers

Satellite television pirates have developed several means of circumventing the DISH Network security system and intercepting DISH Network satellite broadcasts using Free-To-Air ("FTA")[1] satellite receivers.  (Duval Decl. ¶ 15.)  In one method of circumvention, the pirates created software which was programmed onto the FTA receiver so as to mimic a DISH Network smart card.  (*Id.* ¶¶ 15–16.)  Once the FTA receivers were programmed with the card-hack software, the "modified" receiver could decrypt DISH Network's signals without authorization. (*Id.* ¶ 16.)  This method requires the piracy software to be regularly updated in order to overcome countermeasures employed by DISH Network, such as changing the decryption keys required to access proprietary information.  (*Id.* ¶ 17.)

Recently, pirates have developed a new method of obtaining DISH Network's signals without authorization called Internet Key Sharing ("IKS").  (Duval Decl. ¶ 18.)  IKS uses internet-enabled FTA receivers.  (*Id.* ¶ 19.)  In IKS piracy, the decoding keys that allow the decryption of DISH Network's signals are captured from a computer server ("IKS server") that connects with multiple subscribed NagraStar smart cards.  (*Id.* ¶ 20.)  Control words obtained from the authorized smart cards are sent from the IKS server over the internet to unauthorized receivers, where they are used to decrypt DISH Network's satellite signal and view its

---

[1] FTA satellite receivers were originally designed to receive free satellite television channels that carry unencrypted programming.  FTA programming is mostly limited to ethnic, religious, business, music, information, or advertising content, rather than the subscription-based content offered by satellite providers such as DISH Network.

09cv1553

1   programming without paying the subscription fee.  (*Id.*)  In short, IKS servers allow the

2   decoding keys to be shared over the internet such that internet-enabled FTA receivers

3   programmed with modified FTA/IKS piracy software can use these decoding keys to decrypt

4   DISH Network's signals without authorization.  Furthermore, because IKS is based on the

5   trafficking of control words obtained from subscribed DISH Network receiving equipment, this

6   method of satellite piracy remains effective even after DISH Network's transition to "Nagra 3,"

7   the latest generation security technology that was recently introduced by NagraStar.  (*Id.* ¶ 21.)

8

9        **C.**     **Evidence of Defendants' Distribution of Piracy Devices and Piracy Software**

10            **1.**     **Sonicview and the Individual Defendants**

11       Sonicview's business is contracting for the manufacture of, importing, distributing, and

12  servicing satellite receivers and add-on dongles.  (Falvey Decl. ¶ 4 [Doc. 62-2].)  The receivers

13  are sold under the brand name "Sonicview" and include the SV-HD8000, SV-360 Elite, SV-360

14  Premier, and SV-4000.  (Falvey Dep. 42:2–9 [Doc. 137-1].)  The dongle is referred to as the

15  Sonicview iHub.  (*Id.* at 44:19–21.)  Sonicview receivers and iHubs are manufactured in South

16  Korea by Vicxon Corporation.  (*Id.* at 40:24–41:9, 44:22–45:1.)  The company distributed at

17  least 307,401 Sonicview receivers (specifically, 34,236 of the SV-HD8000, 54,929 of the

18  SV-360 Elite, 165,747 of the SV-360 Premier, and 52,489 of the SV-4000) and at least 17,500

19  Sonicview iHubs.  (*Id.* at 65:21–66:3.)

20       Messrs. Pierce, Sanz, and Phu each has a one-third ownership of Sonicview.  (Falvey

21  Dep. 31:18–25; Pierce Dep. 68:3–8; Sanz Dep. 7:9–11; Phu Dep. 10:15–20.)  Each of these

22  defendants also serves as a director of Sonicview.  (Defs.' Supplemental Interrog. Resps.

23  6:23–28.)  And all three defendants hold officer positions: Mr. Pierce serves as Vice President,

24  Mr. Sanz serves as the Chief Executive Officer, and Mr. Phu serves as the Chief Operations

25  Officer and Vice President.  (*Id.*)  Each of these defendants also took part in selecting products

26  that would be sold, setting the pricing, and appointing distributors.  (Pierce Dep. 60:6–61:5,

27  62:16–63:6, 64:21–65:10; Sanz Dep. 83:10–85:5; Phu Dep. 92:12–14, 95:4–97:10.)

28  //

09cv1553

1   Mr. Sanz was in charge of running Sonicview and was the lead salesperson.  (Falvey Dep.
2   86:17–22; Defs.' Supplemental Interrog. Resps. 6:23–25.)  He was involved in making all the
3   final decisions regarding the operation of Sonicview, and was also one of four distributors
4   authorized to purchase Sonicview receivers and iHubs directly from Sonicview.  (Falvey Dep.
5   37:17–20, 51:22–52:8, 103:11–13; Sanz Dep. 83:10–23.)  He purchased receivers and iHubs
6   from Sonicview, and then re-sold the devices to authorized Sonicview dealers.  (Sanz Dep.
7   46:9–18, 48:11–18.)  In that capacity, Mr. Sanz distributed at least 34,380 Sonicview
8   receivers—specifically, 3,131 of the SVHD8000, 6,434 of the SV-360 Elite, 23,275 of the
9   SV-360 Premier, and 1,540 of the SV-4000—and 12,191 iHubs.  (Frank Decl. ¶¶ 7–8.)

10   Duane Bernard was an authorized Sonicview dealer.  (Duane Bernard Dep. 48:20–22.)
11   He purchased Sonicview receivers and iHubs from Mr. Sanz, and re-sold the devices to his
12   customers.  (*Id.* at 42:10–12, 43:5–7, 54:12–14, 55:14–18.)  In that capacity, he distributed at
13   least 4,020 Sonicview receivers—specifically, 563 of the SV-HD8000, 524 of the SV-360 Elite,
14   2,360 of the SV-360 Premier, and 573 of the SV-4000—and 165 Sonicview iHubs.  (Frank Decl.
15   ¶¶ 15–16.)  Duane Bernard also distributed an add-on module for the Sonicview SV-HD8000
16   receiver known as the "A-1 module."  (Duane Bernard Dep. 56:15–23, 58:8–12.)  He also
17   distributed at least 739 A-1 modules.  (Frank Decl. ¶¶ 17–18.)  The A-1 module was described
18   on Duane Bernard's website as an "EchoStar DISH Network 8SPK Enhanced HDTV Module."
19   (Duane Bernard Dep. 87:5–89:8.)

20   Courtney Bernard assisted his brother, Duane, in the distribution of Sonicview receivers,
21   iHubs, and A-1 modules through various websites.  (Courtney Bernard Dep. 36:16–37:6,
22   44:7–14.)  He handled customer services, customer payments, and distribution of the products.
23   (*Id.* at 44:7–14.)  On one occasion, one of the websites owned by Courtney Bernard displayed
24   the following question and answer: "Can I use an FTA receiver to receive premium channels like
25   DISH Network or DIRECTV?  Yes.  To receive these channels requires 3rd party software
26   which we do not provide or condone.  Please visit the independent site FTAlife.com for free 3rd
27   party software info."  (Frank Decl., Ex. 29.)

28

09cv1553

2.      **Expert Analysis of Sonicview's Devices**

a.      **Sonicview's Receivers, iHub, and A-1 Module**

Plaintiffs' expert, Dr. Aviel Rubin, through his company Independent Security Evaluators ("ISE"), analyzed a sample of Sonicview receivers' factory firmware for the models SV-HD8000, SV-360 Elite, and SV-360 Premier. (Rubin Decl. ¶¶ 1–3.) Each model analyzed contained more than one exact match of the proprietary code and data that resides on Plaintiffs' smart card, a particular algorithm important for encrypting and decrypting DISH Network satellite signals, and a graphical user interface. (*Id.* ¶¶ 5–8.) There were strong similarities between the Sonicview receivers' firmware and that of existing piracy firmware. (*Id.* ¶ 9.) Dr. Rubin concluded that Sonicview receivers "have multiple elements that serve no legitimate purpose or use in a receiver intended solely for [FTA] applications," and all of these elements suggest "a cooperative relationship between [Sonicview] and pirate firmware developers." (*Id.* ¶ 10.)

Another expert, Nigel Jones, through his company R.M.B. Consulting ("R.M.B."), analyzed the Sonicview iHub and A-1 module[2] in conjunction with Sonicview receivers. (Jones Decl. ¶ 2.) According to Mr. Jones, the iHub is a serial Ethernet adapter promoted by Sonicview for use with its receivers in order to automatically update receiver firmware, download images and music, and play games. (*Id.* ¶ 4.) However, the iHub lacks software support for firmware updates, and it is particularly impractical for such updates because it costs around $100 per device and updates are infrequent. (*Id.* ¶ 6.) The iHub is also impractical for downloading images and music, and for playing interactive games because of its low bandwidth. (*Id.* ¶ 7.) It comes with a 16-digit code that enables the Sonicview receiver to access the IKS server through the dongle, which in turn allows for the piracy of DISH Network programming when loaded with the piracy software. (*Id.* ¶ 9.) For the Sonicview piracy software to make access to the IKS server contingent on entry of a valid iHub code, the developers of the piracy software and the

---

[2] The Court has already enjoined the distribution of the iHub and the A-1 module in the March 29, 2010 Order that granted Plaintiffs' Motion for Preliminary Injunction.

09cv1553

persons responsible for the IKS server must have a list of valid iHub codes.  (*Id.*)  Thus, Mr. Jones concluded that "the iHub is designed for and has no practical use other than DISH Network piracy," and "the suppliers of iHub are working closely with the persons responsible for Sonicview receiver piracy software and the IKS server supporting Sonicview receivers."  (*Id.* ¶ 10.)

Defendants also provide deposition testimony of an expert, Richard D. Caylor, who stated that the iHub is capable of updating software.  (Caylor Dep. 105:23–107:19.)  He testified that he was able to get the iHub to successfully download new software after three or four times, but that he does not remember whether a new version or simply a different version of the software was installed.  (*Id.* at 107:5–8.)  Mr. Caylor also stated that he was "dissatisfied with the end results" when he connected the iHub to the receiver.  (*Id.* at 108:16–22.)  He did not test the iHub's capability to play games, or download music or images.  (*Id.* at 109:4–17.)

When Mr. Jones analyzed the A-1 module, he found that the module works in conjunction with SV-HD8000—when loaded with piracy software—to receive DISH Network's high-definition programing.  (Jones Decl. ¶ 14.)  The A-1 module contains same principal integrated circuit, the Broadcom BCM4500 demodulator, as the set-top boxes supplied by EchoStar for the DISH Network system.  (*Id.* ¶¶ 11, 13.)  Mr. Jones concluded that "the A-1 module is designed to receive DISH Network's high-definition programming, and has no legitimate commercial purpose or use," and that "the A-1 module and Sonicview receivers are originating from a common supplier."  (*Id.* ¶ 16.)

### b.    The Piracy Software

Sonicview operated www.sonicviewusa.com, which contained piracy software—software intended for use with Sonicview receivers to decrypt DISH Network's satellite television programming—available for download.  (*See* Rogers Decl. ¶¶ 1, 6.)  These piracy software files were made available for download several weeks after certain Sonicview receiver models were mentioned on the website.  (*Id.* ¶¶ 6–8; McMullen Decl. ¶ 13–14.)  A NagraStar security technician tested various Sonicview receivers by loading them with the corresponding piracy

09cv1553

software downloaded from Sonicview's website. (McMullen Decl. ¶ 15.) He found that the piracy software enabled the receiver to circumvent the NagraStar security system and receive DISH Network programming. (*Id.*) The website did, however, contain language whereby Sonicview attempted to disclaim liability pertaining to the illegal use of Sonicview receivers. (Sanz Dep. 101:10–104:1)

Similarly, Duane Bernard established www.ftalife.com, and was the registrant of the website until June 20, 2008. (Duane Bernard Dep. 89:9–22, 94:10–95:6.) He monitored the website and reviewed the files that were made available on the website. (*Id.* at 92:3–18, 93:8–22.) During this time, piracy software for Sonicview receivers were made available for download on that website. (McMullen Decl. ¶¶ 9–10.) The website contained language whereby Duane Bernard attempted to disclaim liability pertaining to the illegal usage of Sonicview receivers. (Duane Bernard Dep. 68:1–70:12, Courtney Bernard Dep. 84:12–86:8.) After Duane Bernard sold the website in June 2008, he continued to direct customers who purchased Sonicview receivers and related products from him to the website for technical support. (Duane Bernard Dep. 98:16–100:22.) He also marketed Sonicview receivers and related products through Google AdWords by selecting search words that would lead the searcher to his website. (*Id.* at 111:19–115:5.)

In addition, Plaintiffs present evidence of Mr. Sanz's alleged distribution of piracy software and development of piracy devices. (*See* Reason Decl. ¶¶ 16–17; Sanz Recording ¶¶ 4:17–7:1.) Specifically, Mr. Sanz stated in a telephone conversation with Plaintiffs' confidential informant that Sonicview "reverse-engineered the card and the card reader and developed it" into a chip that can be plugged into the Sonicview 360. (Sanz Recording ¶¶ 5:24–6:8.) Mr. Sanz also stated that as long as "you have this card . . . the IKS doesn't go down if the card doesn't go down." (*Id.* ¶ 6:23–7:1.) He referred to this as the "bulletproof chip" (or "bulletproof bin") that prevents Sonicview from going down "every time Dish went down." (*Id.* ¶¶ 6:23–7:24.) Mr. Sanz believed that the new chip developed by Sonicview would give the company a competitive advantage over receivers from other brands because it would be able to work around Nagra 3 technology. (*See id.* at 7:3–7, 9:23–10:5.) Plaintiffs also provide

09cv1553

1   testimony asserting that Mr. Sanz discussed Sonicview's distribution of piracy software.  (*See*
2   Sanz Chat at 3:29:43–3:37:47 a.m.; Filon Decl. ¶ 13; Fuss Decl. ¶ 10.)

3        Defendants' expert, Mr. Caylor, says that "[t]here are thousands of free-to-air TV and
4   radio channels that can be received with Sonicview and many other brands [sic] satellite
5   receivers." (Caylor Dep. 67:2–5 [Doc. 169-1].)  He also prepared a list of channels that can be
6   viewed using a FTA receiver.  (*Id.* at 67:6–11.)  The list was compiled using posts by
7   unidentified members of the expert's internet forum.  (*Id.* at 68:8–69:3.)  Mr. Caylor did not
8   personally test the receivers' capabilities to receive FTA channels.

9        On July 17, 2009, Plaintiffs commenced this action.  In the complaint, they assert six
10  claims against all defendants for: (1) violation of the Digital Millennium Copyright Act
11  (DMCA), 17 U.S.C. § 1201(a)(1); (2) violation of the DMCA, 17 U.S.C. §§ 1201(a)(2) & (b)(1);
12  (3) violation of the Communications Act of 1934, 47 U.S.C. § 605(a); (4) violation of the
13  Communications Act of 1934, 47 U.S.C. § 605(e)(4); and (5) violation of the Electronic
14  Communications Privacy Act, 18 U.S.C. § 2511(1)(a).  Plaintiffs also allege a claim under 11
15  U.S.C. § 523(a)(3)(B) that any debt incurred by Duane Bernard in this action is not
16  dischargeable by his bankruptcy.   Thereafter, the Court granted the parties' joint motion to
17  dismiss with prejudice Counts I, III, and V, and Defendants SonicviewRA LLC, Sonicview SA
18  LLC, and Dontpay4tv LLC.  (Doc. 148.)

19       On November 2, 2011, Plaintiffs filed a motion for summary judgment against
20  Defendants on Counts II, IV, and VI of the amended complaint.  (Doc. 136.)  On the same day,
21  Messrs. Phu, Pierce, and Sanz, and Sonicview USA, Inc. (collectively, "Sonicview Defendants")
22  filed their cross-motion for summary judgment.  (Doc. 141.)  Duane Bernard and Courtney
23  Bernard did not join in that cross-motion.  Both motions are opposed.  However, Courtney
24  Bernard, now represented by separate counsel, chose not to join with the remaining defendants
25  in opposing Plaintiffs' motion, and instead filed a separate opposition.
26  //
27  //
28  //

09cv1553

## II.   LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  *Id.* at 322-23.  "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein."  *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001).  Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co. of Am.*, 55 F.3d 247, 251 (7th Cir. 1995)).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence

09cv1553

of a scintilla of evidence in support of the nonmoving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 242, 252). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## III.   DISCUSSION[3]

### A.   Liability Under the Digital Millennium Copyright Act

Section 1201(a)(2) of the Digital Millennium Copyright Act prohibits "manufactur[ing], import[ing], offer[ing] to the public, provid[ing], or otherwise traffic[king] in any technology, product, service, device, component, or part thereof, that—

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected [by copyright];
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected [by copyright]; or

---

[3] Defendants—including Courtney Bernard, who filed a separate opposition to Plaintiffs' summary-judgment motion—offer evidentiary objections to *every* fact put forth by Plaintiffs. (*See* Defs.' Opp'n 3:12–6:13 [Doc. 161]; Courtney Bernard's Opp'n 1:21–7:21 [Doc 168].) However, Defendants provide little legal analysis to support their contentions. Moreover, they provide mostly uncorroborated and self-serving declarations and deposition testimony, which is insufficient to create a genuine issue of material fact. *See Fed. Trade Comm'n v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010); *Batz v. Am. Commercial Sec. Servs.*, 776 F. Supp. 2d 1087, 1097-98 (C.D. Cal. 2011); *see also McSherry v. City of Long Beach*, 584 F.3d 1129, 1138 (9th Cir. 2009) ("Summary judgment requires facts, not simply unsupported denials or rank speculation."). Consequently, insofar as the Court's reliance on any of the evidence that Plaintiffs put forth, the Court **OVERRULES** Defendants' objections. That said, if a particular piece of evidence warrants further discussion, the Court will address the issue.

09cv1553

1

2          (C) is marketed by that person or another acting in concert with that
           person with that person's knowledge for use in circumventing a
3          technological measure that effectively controls access to a work
           protected [by copyright].

4    17 U.S.C. § 1201(a)(2).  In order to establish liability under this section, plaintiffs need only

5    establish that defendants violated one of the three prongs.  *See* 17 U.S.C. § 1201(a)(2).

6    Moreover, potential lawful or fair use is not a defense to § 1201(a) when its requirements are

7    established.  *See Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 913, 942 (N.D.

8    Cal. 2009); *Sony Computer Entm't Am., Inc. v. Divineo, Inc.*, 457 F. Supp. 2d 957, 965 (N.D.

9    Cal. 2006) ("[D]ownstream customers' lawful or fair use of circumvention devices does not

10   relieve [the defendant] from liability for trafficking of such devices under DMCA.").

11          Plaintiffs contend that Sonicview receivers and iHubs are designed and produced to

12   circumvent DISH Network's security system, and used primarily for that purpose. (Pls.' Mot.

13   24:19–30:9 [Doc. 136-1].)  To support their contention, Plaintiffs rely on the following evidence,

14   among others: (1) ISE's and R.M.B.'s expert reports that conclude that the receiver and iHub

15   have several firmware and hardware components that serve limited or no legitimate purpose

16   other than circumvention of DISH Network's security system; (2) R.M.B.'s determination that

17   the receivers and corresponding piracy software likely originate from the same source; (3)

18   deposition testimony and declarations that show Sonicview promoted the use of its receivers by

19   supplying piracy software; and (4) online chat and telephone-conversation recording with Mr.

20   Sanz that show Sonicview marketed its receivers for use in circumventing the DISH Network

21   security system.  (*See id.*)

22          The Sonicview Defendants respond to Plaintiffs' DMCA claim on essentially four

23   grounds: (1) Vicxon Corporation in South Korea solely designed and manufactured the

24   Sonicview-branded receivers and iHubs, and the Sonicview Defendants had no role in that

25   design or manufacturing process; (2) the receivers and iHubs themselves are incapable of

26   circumvention with only factory-installed firmware; (3) the receivers and related products have a

27   legitimate and commercially significant purpose; and (4) the Sonicview Defendants did not

28   market their equipment for use in circumvention.  (*See* Defs.' Mot. 3:12–5:9 [Doc. 141-1];

09cv1553

1    Defs.' Opp'n 3:13–7:26.)

2         Section 1201(a)(2) addresses products that circumvent a technological measure that

3    effectively controls access to a copyrighted work.  Under the statute, "'circumvent a

4    technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or

5    otherwise to avoid, bypass, remove, deactivate, or impair a technological measure without

6    authority of the copyright owner." 17 U.S.C. § 1201(a)(3)(A).  "[A] technological measure

7    'effectively controls access to a [copyrighted] work' if the measure, in the ordinary course of its

8    operation, requires the application of information, or a process or a treatment, with the authority

9    of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B).  The undisputed

10   evidence shows that Plaintiffs employed measures to control access to copyrighted works, and,

11   as discussed further below, that the Sonicview Defendants sold receivers and dongles designed

12   to circumvent Plaintiffs' security measures.  Furthermore, Plaintiffs use complex security

13   measures to prevent unauthorized access to the copyrighted programming that they broadcast,

14   including encrypting the signals and providing equipment necessary for lawful users to decrypt

15   the signals.  (Joint Statement of Undisputed Facts ("JSOUF") ¶¶ 1–9 [Doc. 170].)  Defendants

16   do not dispute this.  (*See id.*)

17        Plaintiffs also present evidence that shows that the Sonicview Defendants' receivers are

18   designed and produced to circumvent Plaintiffs' security measures.  Plaintiffs' experts found that

19   the receivers are structurally altered to accommodate pirating devices, such as the iHub and A-1

20   module.  The combination of a Sonicview receiver, iHub, and A-1 module—all of which

21   Sonicview provides—permits unauthorized access to DISH Network's satellite programming by

22   circumventing Plaintiffs' security measures when loaded with the piracy software.  Though the

23   Sonicview Defendants did not sell the piracy software, there is expert evidence that shows that

24   they distributed the piracy software for use with their receivers and related products by supplying

25   it on the Sonicview website.  Moreover, there is also compelling evidence before the

26

27

28

09cv1553

1    Court—including a recorded telephone conversation[4] and an online chat—that Mr. Sanz was at

2    least minimally involved in the development of the piracy devices.  Defendants fail to present

3    any sufficient evidence to dispute any of this.[5]  Accordingly, the Court concludes that the

4    Sonicview Defendants violated the first prong of § 1201(a)(2) by trafficking its receivers, iHubs,

5    A-1 modules, and piracy software, which are all primarily designed or produced to circumvent

6    measures that control access to copyrighted works .

7         Plaintiffs' evidence also shows that the Sonicview Defendants' receivers and iHubs are

8    primarily used for piracy.  The Sonicview Defendants have sold approximately 330,000

9    receivers and there have been more than 2.5 million downloads of the piracy software that is

10   tailored to operate on Sonicview-branded receivers.  Also, the receivers include proprietary

11   information from DISH Network smart cards and a decryption algorithm used in DISH

12   Network's security system that serve no legitimate purpose.  Similarly, R.M.B. found that the

13   iHub is impractical, if not unable, for use in any capacity when connected with a Sonicview

14   receiver unless it is loaded with piracy software.  Though Mr. Caylor did not reach the same

15   conclusion, his findings nonetheless do not contradict R.M.B.'s.  If anything, Mr. Caylor's

16   finding that "the I-Hub lacks in application for the Sonicview receiver" (Caylor Report 26 [Doc.

17   168-1]) supports R.M.B.'s finding that "the iHub is designed for and has no practical use other

18   than DISH Network piracy" (Jones Decl. ¶ 10).  From these facts, it is reasonable to infer that

19   the receivers and iHubs served the limited purpose of circumventing Plaintiffs' security

20   

---

21        [4] Plaintiffs' confidential informant, Jeffrey Reason, recorded the telephone conversation
     with Mr. Sanz.  (Reason Decl. ¶¶ 1–8.)  Defendants object to the admission of the telephone
22   conversation recording on the grounds that it was illegally recorded without the Mr. Sanz's
     consent, and that the conversation was "misinterpreted." (Defs.' Opp'n 5:17–23.)  As Plaintiffs
23   aptly point out, Defendants fail to cite any law prohibiting the recording or making it
     inadmissible. (Pls.' Reply 6 n.3.)  Furthermore, the recording speaks for itself. "[E]vidence
24   obtained in contravention of state law is admissible in federal court [in federal-question cases],
     so long as no federal law is thereby violated."  *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666
25   (9th Cir. 2003).  Defendants fail to present any justification to support excluding the recording.
     *See id.*  Accordingly, and given that this is a federal-question case, the Court **OVERRULES**
26   Defendants' objection.

27        [5] Defendants provided some evidence to dispute these findings, but merely in the form of
     self-serving and uncorroborated testimony and declarations.  As discussed above, this evidence
28   is insufficient to create a genuine issue of material fact.

09cv1553

1    measures.  Thus, the Court concludes that the Sonicview Defendants also violated the second

2    prong of § 1201(a)(2).

3         Although there is ample evidence that the Sonicview Defendants distributed piracy

4    devices and software, it remains unclear whether they violated the third prong on § 1201(a)(2),

5    marketing a technology used in circumventing an access measure.  Given that Plaintiffs only

6    needs to show that the Sonicview Defendants violated one of the three prongs, and have

7    successfully shown that they violated the first two, the Court need not address the merits of

8    whether the Sonicview Defendants violated the third prong as well.  *See* 17 U.S.C. § 1201(a)(2).

9         In sum, with the exception of Defendants' argument that they did not market their

10   equipment for use in circumventing security measures, all of their responses are either irrelevant

11   or insufficient to show that they did not violate § 1201(a)(2).  Accordingly, the Court finds the

12   Sonicview Defendants liable for violations of § 1201(a)(2).

13

14        **B.    Liability Under the Federal Communications Act**

15        Section 605(e)(4) of the FCA provides that it shall be a violation of the statute where:

16             Any person who manufactures, assembles, modifies, imports, exports,
               sells, or distributes any electronic, mechanical, or other device or
17             equipment, knowing or having reason to know that the device or
               equipment is primarily of assistance in the unauthorized decryption of
18             satellite cable programming, or direct-to-home satellite services, or is
               intended for any other activity prohibited by subsection (a) of this
19             section . . . .

20   47 U.S.C. § 605(e)(4).  Subsection (a) of § 605 prohibits persons from receiving or assisting in

21   receiving, without authorization, subscription-based satellite television programming, such as

22   DISH Network's.  47 U.S.C. § 605(a).  In addition to giving rise to criminal liability, a violation

23   of § 605(e)(4) also gives rise to a civil cause of action in favor of "[a]ny person aggrieved by

24   [such] violation."  47 U.S.C. § 605(e)(3)(A).  Civil remedies include injunctive relief, actual or

25   statutory damages, and costs and attorneys' fees.  47 U.S.C. § 605(e)(3)(B)-(C).

26        Plaintiffs argue that Sonicview's distribution of Sonicview receivers and iHubs violate §

27   605(e)(4) because they are designed and produced to circumvent DISH Network's security

28   system and have no other commercially significant purpose.  (Pls.' Mot. 31:2–6.)  They also

15

09cv1553

argue, for the same reasons, that receivers and iHubs are "primarily of assistance" in decrypting DISH Network's satellite signal without authorization.  (*Id.*)  Further, Plaintiffs add that Sonicview's distribution of its receivers and iHubs are prohibited by the FCA because they are intended for use in receiving DISH Network's satellite signal without authorization.  (*Id.* at 31:21–23.)

The Sonicview Defendants contend that they did not engage in "manufacturing, assembling or modifying the Sonicview receivers and iHubs to make them into circumvention devices."  (Defs.' Opp'n 8:14–16.)  They also add that they did not sell or distribute the receivers and iHubs to primarily assist with stealing DISH Network programming because the receivers and iHubs were incapable of circumvention at the time they are sold and distributed.  (*Id.* at 8:16–20.)

Plaintiffs not only present evidence that the Sonicview Defendants distributed the necessary equipment to intercept DISH Network's satellite signal, but also that the Sonicview Defendants knew or at least had reasons to know the devices were capable of being used for piracy purposes.  This is evident from the fact that Sonicview attempted to disclaim liability for satellite piracy using Sonicview devices, and Sonicview customers often returned Sonicview receivers with piracy software installed.  *See Columbia Cable TV Co., Inc. v. McCary*, 954 F. Supp. 124, 127 (D.S.C. 1996) ("[T]he court finds that the disclaimer demonstrates knowledge of the most probable if not only use of the devices."); *see also Comcast of Ill. X v. Multi-Vision Elecs., Inc.*, 491 F.3d 938, 947 (9th Cir. 2007) (reaching a similar conclusion but for the purposes of enhancing damages).  Additionally, undisputed evidence shows that receivers and iHubs contain designs primarily for the piracy of DISH Network programming and had no other commercially significant purpose.  Rather than presenting facts to dispute any of these findings, Defendants primarily put forth conclusory statements, and incomplete colorful analogies of sawed-off shotguns and kitchen utensils.  (Defs.' Mot. 5:12–6:10; Defs.' Opp'n 8:7–20.)  The Court concludes there is no genuine issue of material fact regarding whether the Sonicview Defendants knew or had reasons to know that the its devices are primarily used to assist in the unauthorized decryption of satellite programming.  Consequently, the Sonicview Defendants are

16

09cv1553

1    also liable for violations of § 605(e)(4).

2

3        **C.    Messrs. Sanz, Phu, and Pierce's Individual Liability for Sonicview's**

4              **Violations**

5            The Ninth Circuit has held that "a corporate officer or director is, in general, personally

6    liable for all torts which he authorizes or directs or in which he participates, notwithstanding that

7    he acted as an agent of the corporation and not on his own behalf." *The Comm. for Idaho's High*

8    *Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v. Ajac*

9    *Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)).  The Ninth Circuit has also

10   noted that "[c]ases which have found personal liability on the part of corporate officers have

11   typically involved instances where the defendant was the 'guiding spirit' behind the wrongful

12   conduct . . . or the 'central figure' in the challenged corporate activity." *Davis v. Metro*

13   *Productions, Inc.*, 885 F.2d 515, 524 n.10 (9th Cir. 1989) (internal citations omitted).  This

14   principle has been by courts applied in copyright cases.  *See e.g.*, *Bangkok Broad. & T.V. Co.,*

15   *Ltd. v. IPTV Corp.*, 742 F. Supp. 2d 1101, 1114 (C.D. Cal. 2010).

16          Plaintiffs contend that Messrs. Sanz, Phu, and Pierce, each have been a "guiding spirit"

17   and "central figure" in the trafficking of Sonicview receivers and iHubs, and therefore are liable

18   for Sonicview's copyright infringement.  (Pls.' Mot. 32:28–33:1.)  They direct the Court to the

19   fact that all three defendants participated in running Sonicview's day-to-day operations, such as

20   selecting the products to be sold, pricing the products, and controlling product distribution.  (*Id.*

21   at 33:5.)  The Sonicview Defendants respond that "none of the individual Defendants authorized,

22   directed or participated in any wrongful conduct, because none of them manufactured, sold or

23   marketed any Sonicview receiver or iHub for circumvention at the time they were distributed by

24   the individual Defendants."  (Defs' Opp'n to Pls' Mot. 9:1.)

25          Although Plaintiffs present more evidence of Mr. Sanz's participation in the distribution

26   of Sonicview receivers, iHubs, and piracy software, the following facts are undisputed: (1)

27   Messrs. Pierce, Sanz, and Phu each has a one-third ownership of Sonicview; (2) each serves as a

28   director of Sonicview; (3) all three hold officer positions, Mr. Pierce as a vice president, Mr.

09cv1553

Sanz as the Chief Executive Officer, and Mr. Phu as the Chief Operations Officer and the other

vice president; and (4) each also took part in selecting the products that would be sold, setting

the pricing, and appointing distributors.  These are uncontroverted facts.  The last fact is

particularly important because it establishes that all three defendants were "guiding spirits"

behind Sonicview's activities, including Sonicview's distribution of piracy devices and piracy

software.  Accordingly, the Court finds Messrs. Sanz, Phu, and Pierce are each individually

liable for the Sonicview receivers and iHubs distributed by their company in violation of the

DMCA and FCA.


### D.    Duane Bernard's Liability

Plaintiffs present undisputed evidence that Duane Bernard was an authorized Sonicview

dealer who sold Sonicview receivers.  (Duane Bernard Dep. 42:10–12, 48:20–22, 49:18–50:19;

Courtney Bernard Dep. 36:16–37:6, 44:7–14; JSOUF ¶¶ 47–48.)  The gist of Defendants'

response is that there is no evidence tying Duane Bernard to any "illegal activity."  (Defs.'

Opp'n 4:10–15, 6:3–13.)  Defendants are mistaken.

The Court has already determined that the Sonicview receivers, iHubs, and A-1 modules

are devices used to circumvent security measures and their distribution constitutes a violation of

the DMCA and FCA.  By Duane Bernard's own admission, he also engaged in the distribution

of, at least, Sonicview receivers and iHubs.  In fact, Plaintiffs present undisputed evidence that

Duane Bernard distributed at least 4,020 Sonicview receivers, 165 iHubs, and 739 A-1 modules.

(JSOUF ¶¶ 49, 51–52.)  Given that the distribution of these piracy products are enough to attach

liability under the DMCA and FCA, and for the same reasons discussed above with respect to

the Sonicview Defendants, Duane Bernard also violated § 1201(a)(2) of the DMCA and §

605(e)(4) of the FCA.

Plaintiffs also seek a finding from the Court that any damages that Duane Bernard is

liable for is not discharged by his Chapter 7 bankruptcy.  (Pls.' Mot. 40:11–41:7.)  They argue

that the requirements set forth in 11 U.S.C. § 523(a) have been satisfied because Duane Bernard

failed to schedule or list his debt to Plaintiffs or otherwise alert Plaintiffs of his bankruptcy

09cv1553

1    filing, and because his debt is "for willful or malicious injury by the debtor."  (Pls.' Mot.

2    40:21–41:7 (citing 11 U.S.C. §§ 523(a)(3)(B), (a)(6)).)  Defendants respond with a scant three

3    sentences, contending that there are "triable issues of material fact as to whether [the claims]

4    were intended and caused willful and malicious injury," the cases that Plaintiffs cite "do not hold

5    that the claims at issue here are non-dischargeable," and Duane Bernard is "entitled to a trial on

6    the merits." (Defs.' Opp'n 9:18–24.)  No further explanation, analysis, or evidence is provided.

7    More importantly, these contentions surmount to nothing more than conclusory statements.

8    Consequently, Defendants fail to meet their burden to defeat summary judgment on this issue.

9    *See Matsushita Electric Indus.*, 475 U.S. at 586.  Therefore, the Court finds that any debt

10   incurred by Duane Bernard in this action is not discharged by his Chapter 7 bankruptcy. *See* 11

11   U.S.C. §§ 523(a)(3)(B), (a)(6).

12

13        **E.    Courtney Bernard's Liability**

14        Courtney Bernard worked at his brother Duane Bernard's storefront.  (JSOUF ¶ 56.)

15   Plaintiffs argue that Courtney Bernard is also liable under the DMCA and FCA for distributing

16   Sonicview receivers, iHubs, and A-1 modules.  To support their argument, Plaintiffs present

17   undisputed evidence that Courtney Bernard owned and controlled an eBay account through

18   which these Sonicview products were sold, owned and managed a PayPal account that supported

19   various websites that sold the Sonicview products, and ran the day-to-day operations at the

20   storefront where Sonicview sold products.  (Pls.' Mot. 10:13–11:1.)  The gist of Courtney

21   Bernard's response is that he is an independent contractor working for Duane Bernard and that

22   the Sonicview products have a legitimate lawful purpose.  (Courtney Bernard's Opp'n

23   1:24–2:18, 3:11–20, 11:18–15:12.)

24        As discussed above, potential lawful or fair use is not a defense to § 1201(a) when its

25   requirements are established. *See Realnetworks*, 641 F. Supp. at 942; *Sony Computer Entm't*

26   *Am.*, 457 F. Supp. 2d at 965.  Furthermore, the Court has already determined that the Sonicview

27   receivers, iHubs, and A-1 modules are products used to circumvent security measures and their

28   distribution constitutes a violation of the DMCA and FCA.  That is, these are piracy devices.

09cv1553

1  Regardless of Courtney Bernard's title, undisputed evidence clearly shows that he was

2  instrumental in distributing these Sonicview products.  For example, Plaintiffs provide

3  transaction logs of Courtney Bernard's PayPal account, which show that he distributed large

4  volumes Sonicview products, including receivers and A-1 modules.  (Frank Decl. Exs. 15–16.)

5  By his own admission, Courtney Bernard stated that he was responsible for distributing

6  Sonicview receivers, among other products, and customer service while his brother purchased

7  receivers.  (Courtney Bernard Dep. 22:12–15, 44:7–14.)  Courtney Bernard's employment status

8  does not wash away these facts.  Therefore, the Court concludes that Courtney Bernard is jointly

9  liable for the 4,924 Sonicview products that were sold with Duane Bernard in violation of §

10  1201(a)(2) of the DMCA and § 605(e)(4) of the FCA.

11

12          **F.      Statutory Damages Under the DMCA and FCA**

13          The DMCA provides for "statutory damages for each violation of section 1201 in the sum

14  of not less than $200 or more than $2,500 per act of circumvention, device, product, component,

15  offer, or performance of service, as the court considers just."  17 U.S.C. § 1203(c)(3)(A).  "The

16  court in its discretion may reduce or remit the total award of damages in any case in which the

17  violator sustains the burden of proving, and the court finds, that the violator was not aware and

18  had no reason to believe that its acts constituted a violation."  *Id.* § 1203(c)(5)(A); *see also Peer*

19  *Int'l Corp. v. Pausa Records, Inc.*, 909 F.2d 1332, 1336 (9th Cir.1990) ("[T]he court has wide

20  discretion in determining the amount of statutory damages to be awarded, constrained only by

21  the specified maxima and minima.").  Courts may award statutory damages for each device sold.

22  *Sony Computer Entm't America, Inc. v. Filipak*, 406 F.Supp.2d 1068, 1074. (N.D.Cal.2005)

23  ("[Section] 1203(c)(3)(A) authorizes a separate award of statutory damages for each device

24  sold"); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F.Supp.2d 1039, 1064 (N.D.Cal.2010)

25  (treating each unit sold as a violation).

26          The FCA authorizes a prevailing plaintiff to recover statutory damages for "each

27  violation" of section 605(e)(4) "in a sum not less than $10,000, or more than $100,000, as the

28  court considers just."  47 U.S.C. § 605(e)(3)(C)(i)(II).  Section 605(e)(4) is violated by each

09cv1553

1   distribution of a piracy device.  47 U.S.C. § 605(e)(4) ("For purposes of all penalties and

2   remedies established for violations of this paragraph, the prohibited activity ... as it applies to

3   each such device shall be deemed a separate violation."); *DIRECTV, Inc. v. Adkins*, 320 F. Supp.

4   2d 474, 477 (W.D. Va. 2004) ([S]ection 605(e)(4) "deems the selling or distributing of each

5   device to be a separate violation.")

6        Although Plaintiffs seek statutory damages for Defendants' violations of the DMCA and

7   FCA, Plaintiffs state that they would "forego statutory damages under the FCA if the relief

8   requested . . . is awarded for Sonicview's violations of the DMCA."  (Pls.' Mot. 33:24–25.)

9   Specifically, Plaintiffs seek damages for the number of Sonicview devices—including receivers

10  and iHubs—distributed by the Sonicview Defendants.  This calculation of damages amounts to

11  $324,901,000 for the at least 307,401 Sonicview receivers and 17,500 iHubs sold in violation of

12  the DMCA at $1,000 per device.  (*Id.* at 36:13.)  In response, the Sonicview Defendants re-argue

13  issues already addressed and resolved above to dispute the request for statutory damages.

14  (Defs.' Opp'n 9:13–16.)  However, Defendants do not dispute the numbers associated with the

15  devices sold that Plaintiffs provide.  Thus, the undisputed evidence indicates that Sonicview

16  distributed at least 307,401 Sonicview receivers.  Therefore, Plaintiffs have established 324,901

17  violations based on Sonicview's sale of at least 307,401 receivers and 17,500 iHubs.  Given that

18  Jung Kwak—the purported "father" of piracy-receiver distribution for the Sonicview

19  Defendants—was assessed $200 per violation in statutory damages, this Court does the same.

20  *See EchoStar Satellite LLC c. ViewTech, Inc.*, No. 07cv1273, 2011 WL 1522409, at *4 (S.D.

21  Cal. Apr. 20, 2011) (Benitez, J.)  Accordingly, the Court awards Plaintiffs $64,980,200 in

22  statutory damages against the Sonicview Defendants.[6]  *See* 17 U.S.C. § 1203(c)(3)(A).

23        Similarly, the undisputed evidence shows that the Duane Bernard and Courtney Bernard

24

25        [6] Plaintiffs indicate that they would forgo seeking damages against Messrs. Sanz, Phu,
    and Pierce for their personal distribution of piracy devices if greater damages are assessed

26  against them as controlling officers and directors of Sonicview.  (Pls.' Mot. 37-12–14.)  Because
    the Court would assess $200 per violation for the individual defendants as well, the damages

27  assessed against them as controlling officers and directors would be greater.  Thus, the condition
    set forth by Plaintiffs to forgo seeking damages against these defendants in their individual

28  capacities has been met.

09cv1553

1   together distributed 4,924 Sonicview products.  Accordingly, the Court awards Plaintiffs

2   $984,800 in statutory damages jointly against Duane Bernard and Courtney Bernard.  *See* 17

3   U.S.C. § 1203(c)(3)(A); *see also EchoStar Satellite LLC*, 2011 WL 1522409, at *4.

4

5          **G.      Permanent Injunction**

6          Plaintiffs seek a permanent injunction enjoining Defendants' unlawful conduct.  Section

7   1203(b)(1) of the DMCA authorizes the Court to "grant . . . permanent injunctions on such terms

8   as it deems reasonable to prevent or restrain a violation."  The Court finds that under the facts of

9   this case, Plaintiffs are entitled to a permanent injunction.

10         Defendants are enjoined from:

11         •       manufacturing, importing, offering to the public, or otherwise trafficking in

12                 Sonicview receivers, software files, or any other technology or part thereof used in

13                 circumventing Plaintiffs' security system or intercepting Plaintiffs' programming;

14         •       circumventing or assisting others in circumventing Plaintiffs' security system, or

15                 otherwise intercepting or assisting others in intercepting Plaintiffs' signal;

16         •       testing, analyzing, reverse engineering, manipulating, or otherwise extracting

17                 codes, data, or information from Plaintiffs' satellite receivers, smart cards, satellite

18                 data stream, or any other part or component of Plaintiffs' security system.

19         Additionally, Defendants are ordered to destroy all Sonicview-branded receivers, iHubs,

20   and A-1 modules in their possession in accordance with 17 U.S.C. § 1203(b)(6).  *See Autodesk,*

21   *Inc. v. Flores*, No. 10-CV-1917-LHK, 2011 WL 337836, at *11 (N.D. Cal. Jan. 31, 2011).

22

23         **H.      Attorneys' Fees and Costs**

24         Section 1203(b)(4)-(5) of the DMCA gives the Court discretion to "allow the recovery of

25   costs by or against any party . . . [and] award reasonable attorneys' fees to the prevailing party."

26   An award of reasonable attorneys' fees and costs is appropriate in this case.  Within **thirty days**

27   from the date this order is issued, Plaintiffs shall submit a motion for attorneys' fees along with

28   evidence detailing the fees and costs incurred, describing the work performed, who performed

09cv1553

the work, time expended, and hourly rates.  Defendants may oppose the request within **fourteen days** after Plaintiffs file their motion.  Both briefs shall not exceed **10 pages** in length.

## IV.    CONCLUSION & ORDER

In light of the foregoing, the Court **GRANTS** Plaintiffs' motion for summary judgment (Doc. 136), and **DENIES** Defendants' cross-motion for summary judgment (Doc. 141). Furthermore, the Clerk of the Court shall enter a judgment in favor of Plaintiffs in the amount of $64,980,200 against the Sonicview Defendants, and $984,800 jointly against Duane Bernard and Courtney Bernard.  Defendants are also permanently enjoined as described above, and ordered to destroy all Sonicview receivers, iHubs, and A-1 modules in their possession.  Finally, Plaintiffs may pursue attorneys' fees and costs as described above.

**IT IS SO ORDERED.**

DATED: May 31, 2012

M. James Lorenz
United States District Court Judge

COPY TO:

HON. WILLIAM V. GALLO
UNITED STATES MAGISTRATE JUDGE

ALL PARTIES/COUNSEL

09cv1553